```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          NORTHERN DIVISION


RONALD D. HAUGHT,                )
                                 )
            Plaintiff,           )
                                 )
       v.                        )       No. 2:08 CV 20 DDN
                                 )
 STATE FARM GENERAL INSURANCE    )
COMPANY,                         )
                                 )
            Defendant.           )
```

**MEMORANDUM AND ORDER**

This action is before the court on the motions of defendant State Farm General Insurance Company (State Farm) for summary judgment (Doc. 16) and to strike plaintiff's untimely response to the motion for summary judgment (Doc. 26), and the motion of plaintiff Ronald D. Haught for an extension of time in which to file his response to the motion for summary judgment (Doc. 28.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 12.) The court held a hearing on June 1, 2009.


### I. BACKGROUND

On February 22, 2008, Plaintiff Ronald D. Haught brought this action against State Farm in the Circuit Court for Ralls County. (Doc. 1.) According to the complaint, Haught's home was destroyed by a fire on March 18, 2006, and suffered a total loss. (Doc. 1 at ¶ 5.) In Count I of the complaint, he alleges State Farm breached the insurance contract by failing to provide full coverage for his loss. (Id. at ¶ 11.) Haught claims he is owed $50,987.16 for real property losses and $56,987.99 for personal property losses under the contract. (Id. at ¶¶ 19, 22.) Count I also includes a claim for vexatious refusal to pay. (Id. ¶ 17.) In Count II of the complaint, Haught seeks a declaratory judgment stating the policy was in force at the time of the fire, the loss was a total loss, and that he is entitled to recover the respective amounts under the policy. (Id. at ¶¶ 26, 27.)

On April 3, 2008, State Farm removed the case to this court, invoking diversity of citizenship subject matter jurisdiction under 28 U.S.C. § 1332(a) and 28 U.S.C. § 1441(a).  (Doc. 1 at ¶¶ 7, 11.)

## II.  MOTION TO STRIKE

State Farm has moved to strike Haught's response to the motion for summary judgment, and has moved to strike Haught's affidavit.  (Doc. 26.)  In support, State Farms notes that the response was untimely filed and failed to specifically admit or deny State Farm's statement of uncontroverted facts, as required by the local rules, and that Haught's affidavit is not based on competent evidence.  (Docs. 26, 27.)  In response, Haught admits that his response to the motion for summary judgment was untimely, but moves for an extension of time in which to file his response.  (Doc. 28.)

Haught filed his response on May 15, 2009.  (Doc. 23.)  According to the Case Management Order, the response was due on May 4, 2009.  (Doc. 13.)  The case is currently set for a jury trial on August 24, 2009.  Under the circumstances, the response was less than two weeks late, will not delay the proceedings, and will not prejudice either party.  The motion for an extension of time is granted.

However, Haught's response fails to comply with Local Rule 4.01.  Under that rule, "[e]very memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists."  E.D. Mo. L.R. 4.01(E).  The rule adds that all matters set forth in the movant's statement "shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."  Id.  Haught's response to the motion for summary judgment contested the statements in State Farm's motion.  (Doc. 22.)  Haught's response to State Farm's motion to strike contested the statements in State Farm's motion to strike.  (Doc. 29.)  To date, Haught has not opposed any of the paragraphs contained in the defendant's statement of uncontroverted material facts.  (Compare Doc. 16 at 1-9, with Docs. 22, 29.)  However, as noted at the hearing, Haught and State Farm agree with most, if not all, of the facts at hand; the parties' disagreement rests only with the amounts at issue.  The motion

to strike Haught's response to the motion for summary judgment is denied.

State Farm also moves to strike Haught's affidavit. In his affidavit, Haught states that he would not have felt safe or comfortable living in a home that had been repaired using fire-damaged materials. (Doc. 24, Ex. 6 at ¶ 6.) He also provides basic information relating to the policy and to his communications with State Farm. (Id. at 1-2.) Haught is certainly competent to testify to his own personal feelings, to information in the policy he held, and to his communications with his insurer. See Fed. R. Civ. P. 56(e)(1). However, in paragraph 11, Haught refers to the dwelling as being a total loss. (Doc. 24, Ex. 6 at ¶ 11.) Because Haught is not competent to testify as to the ultimate issue in dispute, the motion to strike is granted in part, and otherwise denied. Haught's statement that "the dwelling was a total loss" is stricken.

### III. STATEMENT OF UNDISPUTED FACTS

On March 18, 2006, a fire damaged Ronald Haught's residence, located at 4304 West Ely Road in Hannibal, Missouri. (Doc. 2 at ¶ 5.) Haught described the fire damage as extremely catastrophic. (Doc. 24, Ex. 2 at 5.) He thought the living room was a total loss - the floor was burned, the walls and windows were gone, and part of the ceiling was gone. (Id.) The dining room had also suffered tremendous smoke and heat damage, with items melted, burned, and charred. (Id.) The same was true of the master bedroom, the kitchen, the bathrooms, and the second floor. (Id. at 5-6.)

At the time of the fire, the residence was covered by a homeowners policy, State Farm Policy Number 25-GH-3930-9. (Doc. 16, Ex. 1.) Under the policy, loss to the dwelling was limited to $182,000, loss to the dwelling extension was limited to $18,200, and loss to any personal property was limited to $136,500. (Id.) The policy also provided, in relevant part,

**SECTION I - COVERAGES**
**COVERAGE A - DWELLING**

1.  **Dwelling**. We cover the dwelling used principally as a private residence on the **residence premises** shown in the **Declarations**.

    Dwelling includes:
    a.  structures attached to the dwelling;

    b.  materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration or repair of the dwelling or other structures on the **residence premises**;

    c.  foundation, floor slab and footings supporting the dwelling; and

    d.  wall-to-wall carpeting attached to the dwelling.

2.  **Dwelling Extension**. We cover other structures on the **residence premises**, separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered to be other structures.

                                    ***

**SECTION I - LOSS SETTLEMENT**
**COVERAGE A - DWELLING**

1.  **A1 - Replacement Cost Loss Settlement - Similar Construction.**

    a.  We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING**, except for wood fences, subject to the following:

        (1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

        (2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount

>           up to the applicable limit of liability
>           shown in the **Declarations**, whichever is
>           less;
>
>     (3)   to receive any additional payments on a
>           replacement cost basis, you must complete
>           the actual repair or replacement of the
>           damaged part of the property within two
>           years after the date of the loss, and notify
>           us within 30 days after the work has been
>           completed;
>
> ***
>
> **COVERAGE B - PERSONAL PROPERTY**
> 1.    **B1 - Limited Replacement Cost Loss Settlement**
>
>       a.    We will pay the cost to repair or replace property
>             covered under **SECTION I - COVERAGES, COVERAGE B -
>             PERSONAL PROPERTY**, except for property listed in
>             item b. below, subject to the following:
>
>             (1)   until repair or replacement is completed, we
>                   will pay only the cost to repair or replace
>                   less depreciation;
>
>             (2)   after repair or replacement is completed, we
>                   will pay the difference between the cost to
>                   repair or replace less depreciation and the
>                   cost you have actually and necessarily spent
>                   to repair or replace the property; and
>
>             (3)   if property is not repaired or replaced
>                   within two years after the date of loss, we
>                   will pay only the cost to repair or replace
>                   less depreciation.

(Id. at 10, 18-19.)

On March 21, 2006, Bryan O'Bannon, a claims adjustor for State Farm, met with Haught at the damaged property. (Doc. 16, Ex. 3 at 1.) O'Bannon inspected the property, taking pictures and measurements. (Id.) During his inspection, O'Bannon found that most of the heavy fire damage was located in the addition to the house, there was little to no damage in the basement, and many of the walls were still standing. (Id.) O'Bannon believed that several personal items, including the washer, dryer, and items stored in the barn, had not been damaged by the fire. (Id.)

O'Bannon used this information to prepare an estimate. (Id. at 1-2.) Based on this estimate, State Farm paid Haught $79,512.01 for damage to his personal property. (Id.) State Farm also paid him $149,212.81 for the structural damage to his home. (Id. at 2; Doc. 16, Ex. 4.) This amount represented the actual cash value of the loss - that is, this amount equaled the replacement cost minus the deductible and minus any depreciation. (Doc. 16, Ex. 4.) According to O'Bannon, State Farm paid Haught an additional $4,293.46 for structural damage.[1] (Doc. 16, Ex. 3 at 2.) Haught agrees that any items in the barn were not damaged by the fire. (Doc. 24, Ex. 2 at 8.)

On April 24, 2006, Schlipman Construction submitted an estimate for repair costs to the damaged home. (Doc. 16, Ex. 6.) Its estimate totaled $250,960, of which $32,734 was the contractor's profit and overhead. (Id.) Walter Schlipman calculated the estimate after walking through the home and the property. (Doc. 24, Ex. 3 at 3.) The total estimate was the result of some guesswork on individual items. (Doc. 16, Ex. 7 at 12-13.) In addition, Schlipman Construction had "bid high" on most of the items, because the work was not within the company's expertise. (Id. at 15-16). Indeed, Schlipman did not want the job for his company. (Id. at 15.)

Patrick Barnes, of Barnes Remodeling, believed several of the items in Schlipman Construction's estimate were excessive. (Doc. 16, Ex. 9.) Barnes believed the company's labor costs were particularly overpriced, but also noted that some of the material costs were also inflated. (Id.) Yet, excluding the labor costs, Barnes believed the Schlipman Construction bid and the State Farm bid (of $149,212.81) were fairly similar. (Doc. 24, Ex. 4 at 4.) In his opinion, the primary

---

[1] In his memorandum, Haught notes that he received $149,212.81 for his real property losses and $79,512.01 for his personal property losses. (Doc. 23 at 1.) He does not mention receiving the other $4,923.46 from State Farm. (See id.) In his affidavit, Haught notes that he received $149,212.81 for his real property losses and $80,218.55 for his personal property losses. (Doc. 24, Ex. 6 at ¶¶ 10-11.) The affidavit does not explain what accounts for the small difference between the two personal property amounts. (See id.) A letter from State Farm to Haught's lawyer also states that State Farm paid Haught $80,218.55 for his personal property losses. (Doc. 27, Ex. 14 at 3.)

distinction between the two bids revolved around the labor costs. (Id.) According to Schlipman, his labor costs were high because he provided his employees with full benefits, the cost of which was reflected in his labor rates. (Doc. 24, Ex. 3 at 6.) He also believed he paid his employees more than other home builders. (Doc. 27, Ex. 7 at 2.)

O'Bannon attempted to contact Schlipman Construction to reconcile the varying estimates, but was unsuccessful. (Doc. 16, Ex. 3 at 2.) For his part, Schlipman could not remember anyone from State Farm trying to contact him to discuss his company's estimate. (Doc. 16, Ex. 7 at 14.)

In his deposition, Schlipman stated it would have been more expensive for his company to repair the residence than to demolish it. (Doc. 16, Ex. 7 at 5-6.) He thought every scorched stud would have to be taken out to remove the smell. (Id. at 5.) At the same time, Schlipman did not believe the home needed to be demolished; he thought the residence probably could be fixed or remodeled. (Id. at 7, 17.) He noted that most of the exterior siding remained intact and there were rooms where the sheet rock was still intact. (Id. at 4, 5.)

Barnes also believed the home could be repaired. (Doc. 16, Ex. 8 at 5.) That said, he would not feel comfortable using charred studs for wall support, or using charred rafters. (Doc. 24, Ex. 4 at 4.) But he would feel comfortable using studs that only suffered smoke damage. (Id.) Barnes based his opinion on his own expertise and on photographs depicting the damaged home. (Id. at 3, 5.) He did not personally inspect the property or ever speak with Haught. (Id. at 3.)

R. Kirk Hankins, a fire investigator, believed some of the materials in the home were safe to reuse. (Doc. 16, Ex. 12 at 5.) In his opinion, the foundation and floor joists under the addition were not damaged at all. (Id.) The basement and the crawl space were fine. (Id.) In his report, Hankins noted there was no smoke staining or fire damage on the wallboard, counter tops, or stored items that were in the basement. (Doc. 16, Ex. 13 at ¶ 20.) Hankins also found the structural members on the construct, wall studs, ceiling joists, and floor joists were fine and safe to reuse. (Doc. 16, Ex. 12 at 5.) In his report, he noted the walls studs, floor joists, insulation, and electrical

conductors in the basement showed no signs of fire damage. (Doc. 16, Ex. 13 at ¶¶ 23, 28.) The crawl space beneath the new addition showed no signs of either fire damage or smoke staining. (Id. at ¶ 23.)

On the other hand, some of the siding pieces, window casings, and rafters needed to be replaced. (Doc. 16, Ex. 12 at 5.) And in his report, he noted heavy fire damage to the windows in the west exterior. (Doc. 16, Ex. 13 at ¶ 1.) Hankins noted heavy fire damage in other areas of the home as well. (See id. at 1-3.) The east exterior and original structure showed heavy fire damage on the vinyl siding and window shutter, and to the lower gutter, soffit, and siding. (Id. at ¶¶ 9-10.) The south exterior and new addition had heavy fire damage to the entire wall, and to the wall, fascia, soffit, and gutter. (Id. at ¶¶ 11-12.) The north exterior had heavy fire damage to the roof above the bay windows. (Id. at ¶ 15.) The east exterior and new addition showed heavy fire damage to the east slope of the original roof. (Id. at ¶ 16.) The stairway had heavy charring on the risers and construct. (Id. at ¶ 29.) The dining room had heavy fire damage to the ceiling and wall coverings, but no damage to the ceiling nailers. (Id. at ¶ 30.) Finally, the new addition showed heavy fire damage to the ceiling joists, east wall, and bay window constructs. (Id. at ¶¶ 37, 39.)

Still, in Hankin's opinion, the home was repairable. (Doc. 16, Ex. 12 at 6.) Using a rough estimate of $100 per square foot, he believed the house could be repaired for less than its insured value. (Id.) However, Hankins did not have any experience rebuilding fire-damaged homes. (Id. at 4.)

Justin Sanders, a fire investigator for the Hannibal Fire Department, walked through the damaged residence. (Doc. 16, Ex. 11.) During his inspection, he found the family room suffered some of the worst damage. (Id. at 3.) The kitchen and dining rooms also had severe heat and smoke damage. (Id.) The bathroom and two bedrooms in the back of the house had pretty bad damage as well. (Id.) The master bedroom suffered heavy heat and smoke damage. (Id.) In each of the rooms, the smoke line was down to about three feet off the floor. (Id.) Given the depth of the smoke line, Sanders believed the contents of the home were not unusable and could not be salvaged. (Id. at 4.)

In contrast, the basement suffered very little damage. (Id. at 3.) The furnace, water heater, washer, and dryer were all located in the basement, and those items showed little to no damage. (Id.) The crawl spaces in the basement also looked good. (Id.) Sanders believed the contents in the basement could be salvaged. (Id. at 4.) Sanders did not have a professional opinion about the structure of the house. (Id. at 5.) But in his personal opinion, he did not believe the house was destroyed entirely by fire. (Id.)

On February 22, 2008, Haught filed this lawsuit. (Doc. 1.) Sometime before filing the lawsuit, Haught sold the residence and the property on Ely Road. (Doc. 16, Ex. 10 at 5.) At the time of the sale, the house had not been repaired. (Id. at 6.) Because of looters and inclement weather, the condition of the home had deteriorated since the time of the fire. (Id.)

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. Celotex, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

## V. DISCUSSION

In its motion for summary judgment, State Farm argues there are no genuine issues of material fact. First, State Farm argues there is no dwelling extension coverage because there was no damage to any dwelling extension. Second, State Farm argues Haught's dwelling was only partially damaged by the fire, and the damage is insufficient to amount to a total loss. Third, State Farm argues Haught's personal property was only partially damaged by the fire, and the damage is insufficient to amount to a total loss. (Doc. 17.)

In response, Haught argues genuine issues of fact still remain. He argues that various witnesses have testified that they would not feel safe using materials from the dwelling to rebuild it. The damage to these items makes them unsafe for future use, and renders the home a total loss. Haught also argues that the expert opinions vary as to the scope of the losses. Haught no longer argues that State Farm owed him coverage under the dwelling extension coverage section. As a result, Haught is now seeking $89,775.15 from State Farm ($32,787.16 for real property losses and $56,987.99 for personal property losses). (Doc. 23.)

**Real Property**

In any action brought under a fire insurance policy, Missouri's valued policy statute provides that the value of the insured real property is equal to the full amount for which the property was insured when the policy was issued. Mo. Rev. Stat. § 379.140. If the insured real property has suffered a total loss, the measure of damages equals the amount for which the property was insured, minus certain depreciation. Id. The burden of proving any depreciation rests with the insurer. West v. Shelter Mut. Ins. Co., 864 S.W.2d 458, 461 (Mo. Ct. App. 1993). If the insured property suffered only a partial loss, the insured can elect to receive either the amount of damage inflicted on the property or the amount necessary to repair the property to its condition before the fire. Mo. Rev. Stat. § 379.140; Mo. Rev. Stat. § 379.150; see also Glasgow v. Cole, 168 S.W.3d 511, 516 (Mo. Ct. App. 2005) (per curiam) (noting that the measure of damages in a case of

partial loss for real or personal property is the difference "between the reasonable values of the property immediately before and immediately after the casualty."). In cases of partial loss, the insured has the burden to prove the value of the property both before and after the loss. Fire Ins. Exch. v. Bowers, 994 S.W.2d 110, 112 (Mo. Ct. App. 1999). Any dispute as to the monetary amount of the damage may be submitted to a jury. Id.

A structure can be considered a total loss under four different theories: 1) when the structure has lost its identity as a building; 2) when no prudent and uninsured individual would rebuild the structure; 3) when the law prohibits rebuilding; or 4) when rebuilding the structure would be more expensive than simply starting over. Patriotic Ins. Co. of Am. v. Franciscus, 55 F.2d 844, 849-50 (8th Cir. 1932); Stahlberg v. Travelers Indem. Co., 568 S.W.2d 79, 84 (Mo. Ct. App. 1978).

Under the identity theory, a structure is a total loss when it "has lost its identity and specific character as a building, and become so far disintegrated that it cannot be properly designated as a building although some part of it may remain standing." Franciscus, 55 F.2d at 849-50; Stahlberg, 568 S.W.2d at 84. This definition does not require total physical destruction. See Mann v. Grange Mut. Cas. Co., No. 86-155-II, 1986 WL 14223, at *2 (Tenn. Ct. App. 1986). "To say that a building is destroyed only when there has been such a total annihilation of its parts is to use the word in a sense in which it never is used in common speech." Heart of Am. Lumber Co. v. Belove, 28 F. Supp. 619, 620 (W.D. Mo. 1939), aff'd, 111 F.2d 535 (8th Cir. 1940). In other words, the presence of standing walls and usable materials does not preclude a total loss. Mann, 1986 WL 14223, at *2.

A structure can also be considered a total loss under the constructive loss theory. See Stahlberg, 568 S.W.2d at 84. Under this doctrine, "there is a total loss by fire if the building is so damaged that no substantial remnant remains that a prudent uninsured person would use on rebuilding." Id. Language to this effect has been approved in instructing the jury on the issue of total loss. See Cantrell v. Farm Bureau Town & Country Ins. Co. of Mo., 876 S.W.2d 660,

666 (Mo. Ct. App. 1994) (per curiam) (defining total loss to mean the building was so damaged "that no substantial remnant remains that an ordinary, reasonable and prudent uninsured person would use for rebuilding or restoration").

Local laws or ordinances may render a structure a total loss. See Stahlberg, 568 S.W.2d at 84. If municipal authorities prohibit the repair or reconstruction of a fire-damaged building, then the structure is a total loss by operation of law. Id. As a result, a "demolition order is in itself sufficient to support a finding of total loss." Id.

Finally, a structure can be a total loss if rebuilding it would be more expensive than simply starting over. See Franciscus, 55 F.2d at 850; Petrovic v. Standard Fire Ins. Co. of Hartford, Conn., 167 S.W.2d 412, 416 (Mo. Ct. App. 1943). "Although some portion of the building may remain after the fire, [] if such portion . . . will not . . . bring more money than sufficient to remove the ruins, such building is, in contemplation of the law, a 'total loss,' or 'wholly destroyed.'" Franciscus, 55 F.2d at 850; see also Lee R. Russ & Thomas F. Segalla, 12 Couch on Insurance § 175:74 (3d ed. 2008) ("The court may also make a determination that a total loss has occurred based on the fact that it may be economically unfeasible to reconstruct the damaged building.").

Given these different theories, the precise line separating a damaged building from a destroyed or disintegrated building is fact intensive and hardly clear. See Belove, 28 F. Supp. at 620-21; see also Occhipinti v. Boston Ins. Co., 72 So. 2d 326, 328 (La. Ct. App. 1954) ("Just what constitutes a total loss is an interesting and much litigated question."). But as long as the plaintiff makes a submissible case on the issue of total loss, the issue should be submitted to a jury. Petrovic, 167 S.W.2d at 415; see also Stevens v. Norwich Union Fire Ins. Co., 96 S.W. 684, 688 (Mo. Ct. App. 1906) ("Whether the building was a total loss, within the meaning of the law . . . was a question of fact for the jury . . . on the evidence in this case.").

In Petrovic, the plaintiff's expert noted that the side walls of the home were still standing. Petrovic, 167 S.W.2d at 416. Even so, the expert testified that the cost of restoring the home to its original

condition would cost more than simply starting over. Id. The appellate court found this testimony, as well as the testimony of other witnesses, created an issue of fact on "whether or not there was a partial or total loss. . . ." Id.; see also O'Keefe v. Liverpool & L. & G. Ins. Co., 41 S.W. 922, 922-24 (Mo. 1897) (affirming the jury's verdict of total loss, where, among other evidence, the architects and builders testified that repairing the walls "would be much more costly than taking down the whole of the walls, and building them anew. . . .").

As in Petrovic, Haught has pointed to testimony that places the cost of repair above and beyond the value of his home. State Farm attacks the methodology and impartiality of this testimony. But attacks regarding the completeness of an expert's methodology or his conclusions go to the weight, rather than the admissibility, of an expert's testimony. Kudabeck v. Kroger Co., 338 F.3d 856, 861 (8th Cir. 2003); Sphere Drake Ins. PLC v. Trisko, 226 F.3d 951, 955 (8th Cir. 2000). Any bias or lack of expertise on the part of the expert also goes to the weight, not the admissibility, of the testimony, and should be brought out on cross-examination during trial. DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir. 2000); Williams v. Pro-Tec, Inc., 908 F.2d 345, 348 (8th Cir. 1990). More to the point, Patrick Barnes, State Farm's expert, believed Schlipman's bid and State Farm's bid were fairly similar if he excluded the labor costs.

In addition to Schlipman's testimony, other expert testimony indicated the rafters and wall studs suffered heavy fire damage and needed to be replaced. These experts also indicated that the siding, the windows, the gutters, parts of the roof, part of the ceiling, part of the wall coverings, some of the walls, and some of the ceiling joists had suffered heavy fire damage. See Mann, 1986 WL 14223, at *2 (finding that the building was a total loss, where there was heavy fire damage to the roof, the electrical wiring, the doors and windows, the plumbing, the second floor, the walls, the insulation, portions of the deck, and some of the wall studs); see also O'Keefe, 41 S.W. at 922-24 (affirming the jury's verdict of total loss, where, among other evidence, there was heavy fire damage to the joists and some of the walls, and the roof and window sills were destroyed).

Summary judgment is available to a defendant arguing the insured did not suffer a total loss within the meaning of a valued policy statute. Wickman v. State Farm Fire & Cas. Co., No. 07-C-352, 2009 WL 792766, at *7 (E.D. Wis. Mar. 24, 2009). In Wickman, photographs of the house showed some charring, but revealed that the exterior was largely unaffected by the fire, and that the structure "was still recognizable as a house." Id. Based on these photographs, the court concluded that no reasonable trier of fact could conclude that the house was wholly destroyed. Id.

In this case, the parties have not provided the court with any such photographs. Instead, one expert has testified that the cost to repair the home exceeds its overall value. Another expert has testified that the home suffered heavy fire damage in a number of different places. Looking to Petrovic, Mann, and O'Keefe, Haught has made a submissible case on the issue of total loss, and the issue should be submitted to a jury.

**Personal Property**

The term "total loss" does not mean exactly the same thing when applied to personal property, as it does when applied to real property. State ex rel. N. British & Mercantile Ins. Co. v. Cox, 270 S.W. 113, 115 (1925). A building on a piece of real estate is one indivisible item; it is not separable into parts. Id. Personal property, on the other hand, may cover a number of articles, each of which can be separated into parts. Id. In the case of personal property, the burden of proving the value of the property at the time of the loss rests with the insured. Id.; West, 864 S.W.2d at 461. At the same time, the insurer may not deny that the insured property was worth the full amount for which it was insured when the policy issued. Cox, 270 S.W. at 115. In a case concerning personal property coverage, the question of whether the loss was a total loss or a partial loss "always is a question for the jury where the fact is disputed." Id. (emphasis added); Sharaga v. Auto Owners Mut. Ins. Co., 831 S.W.2d 248, 254 (Mo. Ct. App. 1992) (per curiam) (noting that the issue of whether or not the insured's personal property items were destroyed was "one for the jury").

Indeed, it can be reversible error for a trial court <u>not</u> to allow the jury to decide whether a loss was partial or total. See <u>Miller v. Farm Bureau Town & Country Ins. Co. of Mo.</u>, 6 S.W.3d 432, 439 (Mo. Ct. App. 2000). In <u>Miller</u>, the trial court failed to instruct the jury on the possibility that the insured's personal items had not suffered a total loss, or that the value of the plaintiff's loss might have been less than the policy limit. <u>Id.</u> (citing the partial loss statute, Mo. Rev. Stat. § 379.150). The appeals court found this error, particularly where there was evidence that certain personal property items were salvaged with little or no damage. <u>Id.</u> On remand, the jury was to be given the opportunity to consider a partial loss award. <u>Id.</u>

During his inspection of the home, Justin Sanders noted the furnace, water heater, washer, and dryer were all located in the basement, and that those items showed little to no damage. (Doc. 16, Ex. 11 at 3.) Bryan O'Bannon, the State Farm claims adjustor, also believed the washer and dryer had not been damaged by the fire. (Doc. 16, Ex. 3 at 1.) On the other hand, Haught has prepared a thirty-page itemized spreadsheet, listing the replacement cost of all of the personal property items allegedly damaged by the fire. (Doc. 24, Ex. 1 at 1-30.) Among these items, Haught seeks the replacement cost for a washer ($900) and a dryer ($800). (<u>Id.</u> at 20.) The overall sum of all the totals listed in the spreadsheet equals $170,092 – an amount exceeding the personal property policy limit. (<u>Id.</u> at 1-30; Doc. 24, Ex. 6 at ¶ 8.) An insured can prove the value of an item at the time of the loss by providing this type of inventory. <u>Riccardi v. U.S. Fid. & Guar. Co.</u>, 434 S.W.2d 737, 741 (Mo. Ct. App. 1968). Under the circumstances, this inventory creates an issue of fact as to whether Haught's personal property was either totally damaged or only partially damaged by the fire.

During a trial on the issue, an insured is considered competent to testify as to the reasonable value of his personal property prior to its damage, without any further qualification. <u>Sharaga</u>, 831 S.W.2d at 253. At the same time, nothing requires a jury to accept this testimony. <u>West</u>, 864 S.W.2d at 461. A jury is free to reject the insured's

personal property valuations even if the valuations are uncontradicted and unimpeached.  <u>Id.</u>

## VI.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant State Farm General Insurance Company for summary judgment (Doc. 16) is denied.

**IT IS FURTHER ORDERED** that the motion of defendant State Farm General Insurance Company to strike plaintiff's untimely response to the motion for summary judgment, and to strike plaintiff's affidavit (Doc. 26) is granted in part, and otherwise denied.  Haught's statement that "the dwelling was a total loss" is stricken.

**IT IS FURTHER ORDERED** that the motion of plaintiff Ronald Haught for an extension of time in which to file his response to the motion for summary judgment (Doc. 28) is sustained.


     /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on July 27, 2009.